## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| JOHN DOE, by and through his Father and natural guardian, PARENT 1, | : | |
| | : | |
| | : | CASE NO: |
| **and** | : | |
| | : | JUDGE: |
| PARENT 1, Father to John Doe, Individually, | : | |
| | : | |
| **and** | : | |
| | : | |
| PARENT 2, Mother to John Doe, Individually, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| REYNOLDSBURG CITY SCHOOL DISTRICT BOARD OF EDUCATION; | : | |
| | : | |
| **and** | : | |
| | : | |
| GREG POLLOCK, Individually and in his Capacity as Executive Director of Business and Operations at Reynoldsburg City Schools, | : | |
| | : | |
| Defendants. | : | |
| | : | |

## COMPLAINT AND JURY DEMAND

**NOW COME** John Doe, Parent 1 and Parent 2 ("Parents"), by and through undersigned counsel, and hereby submit the following complaint against Defendants as captioned above.

## SUMMARY OF INCIDENT

1. This complaint arises from the reckless failure of Defendants in protecting John Doe, as well as the subsequent and intentional national origin discrimination committed by the Reynoldsburg City School District Board of Education (hereinafter "RCS" or the "District") and Defendant Greg Pollock against RCS preschool student John Doe and his Parents.

2.      Plaintiffs' claims arose on February 16, 2023, when the whereabouts of John Doe, a 6-year-old, non-verbal child with autism, went unknown and undocumented for his entire school day. At the time of the incident, John Doe was attending a preschool operated by RCS for afternoon classes. As a non-verbal child with autism, John Doe was particularly vulnerable to harm and required regular supervision. The RCS administrators identified herein failed to adequately supervise John Doe and thereafter failed to investigate and document the circumstances surrounding John Doe's disappearance.

3.      Further, Defendant Greg Pollock, in his capacity of as the Executive Director of Business and Operations at RCS, deliberately and intentionally ended all communication with Parents, both of whom are non-native English speakers, by instructing the assigned RCS interpreter to end all communications with them. Parents were initially communicating with RCS administrators, *via* the interpreter, to determine the whereabouts of their son for the school day in question, to request an investigation, and to request a copy of the school bus video which would have resolved any unanswered questions.

4.      The requested video would have revealed whether John Doe was left unattended on the school bus for the entire afternoon or for some shorter duration, after dismissal from school. Upon information and belief of Parents, John Doe was left unaccompanied (and possibly harnessed on an empty school bus) for the entire afternoon. Despite immediate and repeated requests for the bus video by the Parents, Defendants failed to preserve such video, which was ultimately overwritten and deleted. School records obtained months after the incident indicate that John Doe was in fact absent from his preschool class that day, indicating that John Doe was left unaccompanied on the bus – or elsewhere – for several hours.

5. RCS failed to abide by its own Policy, that being Policy 8600, which mandated, "the installation and use of video recording devices in the school buses to assist the drivers in providing for the safety and well-being of the students while on a bus."

6. Plaintiffs were treated differently because of their national origin and because of their need for an interpreter.

7. The acts by Defendants violate the federal and state laws identified herein.

## JURISDICTION AND VENUE

8. This Court has exclusive subject matter jurisdiction over this matter pursuant to 28 U.S.C. §1331 insofar as this Complaint raises issues under the Fourth and Fourteenth Amendment of the United States Constitution. This Court also has subject matter jurisdiction pursuant to 28 U.S.C. §1343, which gives district courts original jurisdiction over: (a) any civil action authorized by law to be brought by any person to redress the deprivation, under color of any state law, statute, ordinance, regulation, custom, or usage, of any right, privilege, or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States; and (b) any civil action to recover damages or to secure equitable relief under any Act of Congress providing for the protection of civil rights.

9. This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. §1367 because the state law claims asserted by Plaintiffs form part of the same case or controversy as the constitutional and federal claims.

10. Plaintiffs bring an action for discrimination based on national origin, pursuant to Title VI of the Civil Rights Act of 1964, 42 U.S.C. §2000d.

11.     Plaintiffs also bring an action pursuant to the Title II of the Americans with Disabilities Act, 42 U.S.C. §12131, *et seq.* and Section 504 of the Rehabilitation Act, 29 U.S.C. §794.

12.     The events giving rise to this lawsuit occurred in Franklin County, Ohio, located in the Southern District of Ohio, Eastern Division.  Venue is proper in the United States District Court, Southern District of Ohio, pursuant to 28 U.S.C. §1391(b)(2), in that this is the judicial district in which the events giving rise to the claims occurred. Venue is also proper in the Southern District of Ohio under 18 U.S.C. §1965 and 28 U.S.C. §1391(c), as the claims arise in this district and all Defendants reside or maintain a principal place of business within the district.

13.     Plaintiff's Complaint is timely filed within the applicable statutes of limitation.

## PARTIES

14.     At all relevant times, Parent 1 and Parent 2 were the natural parents of a minor child, John Doe, and were residents of Franklin County, Ohio.

15.     At all relevant times, John Doe resided with his parents in Franklin County, Ohio and was a student at RCS.  John Doe is a qualified student with a disability under the Individuals with Disabilities Education Act (the "IDEA") and qualified as a person with a disability under Section 504 of the Rehabilitation Act ("Section 504") and Title II of the Americans with Disabilities Act (the "ADA").

16.     Defendant RCS was at all relevant times a political subdivision under Ohio Revised Code §2744.01, specifically a board of education operating a public educational institution in Franklin County, Ohio, organized and existing under the laws of the state of Ohio, with its principal place of business at 7244 East Main Street, Reynoldsburg, Ohio 43068.

17.     Defendant Greg Pollock, in his individual and official capacity, maintains a principal place of business through his employment at RCS, located at 7244 East Main Street, Reynoldsburg, Ohio 43068.

## FACTUAL ALLEGATIONS

18.     John Doe is a non-verbal, then-6-year-old child diagnosed with autism spectrum disorder who received special education and related services through RCS.

19.     At all relevant times, Defendant Pollock, as Executive Director of Business and Operations at RCS, was responsible for the RCS Transportation Department ("Transportation Department").

20.     The Transportation Department has specific procedures that must be followed every day to ensure John Doe and other students make it to and from school safely and in compliance with RCS policies and Ohio law.

21.     John Doe's specific transportation needs are detailed in his September 10, 2021, Individualized Education Plan ("IEP"), including "accommodations or modifications for transportation" and the use of a "securement system."

22.     Parents regularly observed RCS staff securing John Doe into his harness when they put John Doe on the bus and releasing him from the harness when he arrived home.

### The Day in Question: February 16, 2023

23.     The typical RCS preschool day began at 1 p.m. and ended at 4:15 pm.

24.     John Doe was assigned to ride school Bus #13 to school each day, boarding the bus at approximately 12:49 p.m. each afternoon. Bus #52 is the bus that John Doe would normally ride home from school.

25.     John Doe's family lives approximately 4 minutes by car from the preschool that John Doe attended.

26.     On February 16, 2023, Parent 2 escorted John Doe from the front of their home to Bus #13 at approximately 12:49 p.m. John Doe was harnessed into his securement system by an aide or the bus driver that day.[1] Nothing seemed out of the ordinary to Parent 2 when sending John Doe to school.

27.     Based on records later obtained by the Parents, at approximately 4:17 p.m. that afternoon, an unknown preschool teacher helped board preschool students onto Bus #1, which was being driven by a different bus driver, Phyllis Mayberry. Bus #1 was purportedly being used as a substitute bus that day because the driver of Bus #52 was unavailable.

28.     In a subsequent explanation provided by RCS, it was reported that an unknown preschool teacher advised the driver of Bus #1, Ms. Mayberry, that John Doe was absent from school that day.[2] RCS claimed that the preschool teacher indicated to the bus driver that, "the first student on the route [referring to John Doe] is not present." It was reported by RCS that the attendance sheet given to the bus driver on February 16, 2023, indicated that John Doe was not in attendance at preschool that day.

29.     John Doe failed to arrive home on the bus by the expected time of 4:30 p.m. on February 16, 2023. Prior to this date, if a bus was delayed, Parents received a text, email or phone call from RCS noting the delay.

30.     On this date, Parents did not receive any communication regarding transportation delays.

---

[1]  However, despite placing John Doe on the bus on February 16, 2023, John Doe's Parents later learned that the RCS official attendance records for John Doe are completely blank for that day (and for the full school year).

31.     With grave concern for John Doe's whereabouts, Parent 2 called Parent 1 at approximately 4:40 p.m. to alert him that John Doe had not yet arrived home from school.

32.     Parent 1 left work immediately after receiving the call and arrived home by 4:50 p.m.

33.     At approximately 4:50 p.m., Parent 1 called the Transportation Department (or bus garage) numerous times, but no one answered his calls.

34.     Parent 1 also called the RCS Preschool numerous times, but no one answered the phone and there was no emergency number provided.

35.     Parent 1 left his home and arrived at the preschool at 5:00 p.m.

36.     Parent 1 met a lone, unknown teacher leaving for the day in the parking lot, who assured Parent 1 that she was the only person left in the building. This teacher told him that John Doe was probably on the school bus and instructed Parent 1 to go home to wait for his son's arrival.

37.     Parent 1 returned home and waited an additional 10 minutes for the school bus, which never arrived.

38.     At 5:10 p.m., Parent 1 called the Reynoldsburg Police Department and reported to the dispatcher that his nonverbal, 6-year-old son never arrived home from school and was missing.

39.     Reynoldsburg Police Officer, Emily Coackley, arrived at the family home and interviewed Parents.

40.     Officer Coackley called the bus garage and preschool but was unable to reach anyone at either location.

41.     Suspecting that John Doe may have been left on the bus at the garage unattended, Officer Coackley reached out to a Reynoldsburg Police dispatcher, Maya Robinson, who sent Officer Carlton Davis to the bus garage to see if the child was left alone on a bus at the garage.

42.     At approximately 5:40 p.m., Officer Coackley, still at the home of Parents, received a radio call indicating that John Doe was on Bus #1 and heading home. It is unknown as to how Officer Carlton Davis came to learn that John Doe was on Bus #1, or if he saw John Doe or anyone else from RCS at the bus garage.

43.     Bus #1 arrived with John Doe in front of a neighbor's home at 5:49 p.m., 79 minutes past the typical and expected time of arrival.

44.     Officer Coackley boarded the bus, while John Doe was still strapped in his seat, and spoke to the substitute bus driver, Ms. Mayberry, for approximately five minutes.

45.     John Doe was then escorted off Bus #1 by Officer Coackley in front of the neighbor's home.

46.     John Doe appeared confused and sad and ran toward a neighbor's house.

47.     Parent 1 ran after his son, picked him up, and brought him home.

48.     It was and remains entirely unclear as to where John Doe was between 12:49 p.m., when he was first strapped into a harness on Bus #13, through the time he arrived home harnessed into a seat on Bus #1 at 5:49 p.m.

49.     Upon information and belief, and from records later obtained by the Parents, John Doe was not in attendance at RCS Preschool on February 16, 2023. A preschool teacher reported that he was absent, both on a form (which has not yet been provided to Parents) and orally to the driver of Bus #1. It is unclear if John Doe was unaccompanied or subjected to accident or abuse for the afternoon in which he was unaccounted for.

50.     If John Doe was left unattended on the bus, as a non-verbal child with Autism Spectrum Disorder, John Doe would not be able to alert anyone.

51.     If he was subjected to harm, John Doe would be unable to alert anyone nearby or to share these details after-the-fact.

52.     On the day in question, the temperature in Reynoldsburg, Ohio was between 48- and 54-degrees Fahrenheit, and the weather was rainy and humid.

**Requests for Video, Obstruction, Failure to Investigate, and Deletion**

53.     Beginning February 17, 2023, Parents stopped sending John Doe to RCS Preschool, as they were concerned for his wellbeing. On the same date, the day after John Doe went unaccounted for, Parent 1 made the first of several requests to view the bus video. Notably, the bus video constitutes a student education record, because it contains information about John Doe and was maintained by RCS. Parent 1 also requested an investigation into what happened to John Doe that afternoon. These requests were made to the RCS-provided interpreter, Mr. Mukti Rijal. Rijal assured Parent 1 on the phone call that he would speak to the proper personnel at RCS and make the requests on Parents' behalf. Parents relied upon the interpreter for all communications with RCS staff, as Parents speak limited English and are of Nepali descent.

54.     A meeting between RCS and the Parents was initially scheduled for February 17, 2023. The purpose was to discuss the matter with RCS Preschool and Transportation Department personnel, but RCS cancelled the meeting without explanation. However, interpreter Rijal did email a request to RCS Interim Preschool Coordinator, Jennifer Stewart, as follows:

> I received a call from [John Doe's] dad. He said that yesterday [John Doe] did not come home until 5:49 pm. He called the preschool school, bus garage and even RPD to find [John Doe's] whereabouts. Preschool never picked up his calls and so did the bus garage. After he tried calling school and no luck getting ahold of any personnel, he called RPD to get help from them. At around 5:49 a bus driver brought him home. The bus driver did not give him a good reason as to why they had to bring [him] home late. This shows how carelessly the district/transportation department and the school is handling this situation. He is concerned about this incident because [John Doe} is a child with communication problems and he cannot tell who or where he went with between the time from 4:15 to 5:49. He is also

concerned about how school communicates things like this. He expressed that he felt unsafe to send [John Doe] to school because this type of incident compromised his child's safety. He would like to get a full investigation report on this incident that happened yesterday. Whether [John Doe] was on the bus throughout the time or was he at school with an adult. Why were parents not informed about [John Doe] coming home late?

Within minutes, Interim Preschool Coordinator Jennifer Stewart responded to the interpreter:

I included Jacob [Wilhite, RCS Director of Transportation] in this email as he may have additional information that I do not have. [John Doe] rides Bus 52 home. The bus arrived here at the preschool just before 4:30 PM. It was loaded and left around the normal time. There was a sub driver on the bus.[3] I was not here last night as I was off due to my son having a medical procedure. [John Doe's] father messaged his teacher via remind at 4:43 PM and she let him know that [John Doe] was on the bus. He asked where the bus was and she directed him to call the bus garage. He later told her that they were calling 911 and had the police at the bus stop.

I cannot be certain of this, but my guess is that it was a sub driver on a route that she did not know which took her much longer than it normally would have. Unfortunately, if we don't know that is happening, we cannot share information with families. Preschool staff, admin included are finished working at 4:30 PM. Often Christina and I stay later than that, particularly when the buses are late. Yesterday it was my understanding that we did not have late buses so staff left on time. That means there is no one here to answer the phone. If one of us is not here the phone often goes unanswered and we have to return messages because there is no secretary and we have students in classrooms to support or arrival/dismissal, meetings, answering the door for someone, etc. I do not know about transportations hours. I do know that often everyone in the department is driving, which would make it challenging to answer the phone. Please let me know if there is any additional information you need from me.

55.    A virtual meeting was thereafter arranged for February 22, 2023. Parent 1 attended with the interpreter. RCS attendees included the Transportation Supervisor, Jacob Wilhite, and Interim Preschool Coordinator, Jennifer Stewart. Parent 1 again requested to see the bus video. Wilhite and Stewart promised Parent 1 they would investigate the incident and obtain a copy of the video.

---

[3] John Doe arrived home on Bus #1, not Bus #52.

56.     Thereafter, Wilhite and Stewart also attended a February 24, 2023, meeting with Parent 1 and the interpreter. Parent 1 again requested to view the bus video, and Stewart again indicated she would help facilitate the request the bus video, as follows:

> When we met earlier today we discussed your concerns around transportation and [John Doe], you requested to view the video of your child on the bus from the evening of Thursday February 16, 2023. I told you that I would connect you with Jaime Scott, Director of Student Services for approval of your request. I am connecting you with Dr. Jocelyn Cosgrove, Director of Academic Services. Jamie is out on leave at this time and may not be able to respond to the request.

57.     In response, on February 28, 2023, RCS Director of Academic Services, Jocelyn Cosgrove replied, "Mr. Wilhite [Director of Transportation], CC'd on this email, will be able to get the video you've requested."

58.     On March 3, 2023, Parents again requested to see the bus video, *via* interpreter Rijal. Thereafter, interpreter Rijal emailed RCS Safety and Security Director, Jim Ramsey, reminding him of the Parents' requests to view the video. Ramsey then emailed Wilhite, making the same request. Again, no video was made available.

59.     On March 7, 2023, Defendant Pollock, RCS Executive Director of Business Services and Operations, emailed Parent 1 and defended the bussing oversight, *inter alia*, as follows:

***

> As you know, the district had a very stressful situation take place on February 22, 2023 at Livingston High School. The school was on lockdown and that included the Preschool until well after the normal school day due to a threat involving a gun.

> On the afternoon of February 22, I understand that your child was on the school bus for over an hour. Although that is concerning, it does not surprise me. I was driving a bus that afternoon and did not get back to the garage until near 6:00pm myself after taking home students. All of our buses ran late due to the delay and uncertainty of the situation. A decision was made to take home all other schools first, then loop back to Livingston once released, including our Preschool. As a team, we scrambled to get available drivers to cover the added routes when the ALL CLEAR announcement was made. Many of our regular route drivers had their own family

matters to attend to since it was well after the normal work day, thus further complicating our challenges.

\*\*\*

60.     However, the gun incident described by Pollock occurred on February 22, as correctly identified in his email. John Doe went missing on February 16, 2023, six days earlier. Therefore, Pollock's explanation for the incident was fabricated.

61.     In the same March 7, 2023 email message to Parent 1, Pollock communicated that the bus video was no longer available, as he "was just made aware of [the] request." Pollock claimed that the video had been overwritten because of the "lapse in time." However, Pollock had known about the incident with John Doe going missing since the day after the incident, on February 17, 2023, when he received an email documenting the incident from Wilhite. He was also reminded of the Parents' request several times after February 17. Therefore, Pollock's justification for the video deletion was similarly fabricated.

62.     Three days later, on March 10, 2023, Pollock emailed interpreter Rijal (and several other RCS administrators) and asserted that a full investigation was completed on the incident. Pollock claimed in his email to the interpreter:

\*\*\*

Please understand that a full investigation was conducted, staff interviewed, incident reviewed, *etc* as I communicated to the parent in my email. At no time was the child in danger and arrived safely to and from school on a school bus. Please be very careful with any such accusations inferred or otherwise on your part that anyone involved is withholding information or not being transparent. Our #1 job is child safety.

\*\*\*

63.     Importantly however, Parents have received no investigation records, notes of interviews, or documented investigation outcomes despite several requests (made after Pollock's March 10, 2023, assertion that an investigation was conducted). Pollock then continues in his March 10, 2023, email, instructing interpreter Rijal to cease communications with the family:

\*\*\*

Please do not reach out or communicate with the parent on my behalf or on the behalf of anyone you copied on the email, nor further share the contents of this email with the parent without my consent. I have communicated and provided my contact information should the parent have a need to convey concerns moving forward.

\*\*\*

64.     Interpreter Rijal thereafter ceased all communications with the Parents, effectively ending Parents' ability to communicate with any RCS employee on any matter whatsoever, as RCS had no other Nepali interpreter available. Parents have not communicated with interpreter Rijal since this directive was given by Pollock.

### Effect on John Doe and His Parents

65.     Following the February 16, 2023, incident, John Doe began having tantrums and outbursts. This behavior continued for months following the incident. In addition to the emotional distress and physical trauma endured through this neglect and suspected abandonment, John Doe has suffered a denial of his right to a free and appropriate education as a child with a disability, since he was unable to return to preschool following the event.

66.     Parents suffered damages due to the incident, including emotional distress, distrust of school officials, and lost wages for the time spent dealing with this incident. Both John Doe and his Parents have suffered mentally and emotionally because of the intentional spoliation of the bus video and because of the directive given by Defendant Pollock to the interpreter to end all communications with the family.

67.     Plaintiffs have been treated differently than similarly situated parents because of their national origin, language barrier and need for an interpreter.

68.     John Doe has further been discriminated against by Defendants based on his disability (namely his Autism and inability to speak) by denying John Doe safe transportation on February 16, 2023, and educational services on and after that date.

69.     John Doe and Parents seek relief from this Court for the harm.

## COUNT I

**Violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d**

70.     Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

71.     Title VI prohibits discrimination based on "race, color, or national origin …under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

72.     The purpose of Title VI is to ensure that public funds are not spent in a way that encourages, subsidizes, or results in discrimination on these bases. Toward that end, Title VI bars intentional discrimination. *See Guardians Ass'n v. Civil Serv. Comm'n*, 463 U.S. 582, 607–08 (1983); *Alexander v. Choate*, 469 U.S. 287, 292–93 (1985).

73.     Defendant RCS is a recipient of federal financial assistance.

74.     Parent 1 and Parent 2 are of Nepali descent. Parents face barriers to participating fully in John Doe's education because of limited English proficiency.

75.     RCS must ensure that students and families with limited English proficiency are identified and interpreters provided so that students and their parents can meaningfully participate in all educational programs.

76.     Limited English proficiency students, like John Doe, are entitled to an equal opportunity to participate in all programs, including pre-kindergarten.

77.     John Doe's Parents, require the services of an interpreter to facilitate their interactions with RCS made on behalf of John Doe.

78.     RCS failed to initiate and pursue an investigation into the whereabouts of John Doe due to the Parents' limited English language.

79.     Parents, through interpreter Rijal, made repeated requests for an investigation and to view the bus video. Such requests were denied or delayed because of Plaintiffs' national origin or limited English proficiency.

80.     Defendants intentionally discriminated against Parents and John Doe when they directed the interpreter to cease all communications with the parents. Parents were effectively denied the ability to participate in their son's education and verify his wellbeing.

81.     Because of Defendants' actions, John Doe was unable to attend school after the incident and not able to receive the educational benefits to which he was entitled.

82.     Because of Defendants' actions, Parents were unable to advocate for John Doe and unable to send him to school after the incident.

83.     As a direct and proximate result of Defendants' actions and inactions, John Doe and Parents have sustained injuries and damages, including, but not limited to, loss of their fundamental constitutional rights; economic loss; mental and emotional distress, including anxiety, mental anguish, humiliation, and embarrassment; psychological damage; and loss of the ordinary pleasures of everyday life.

## COUNT II

### Violation of the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution, via 42 U.S.C. §1983

84.     Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

85.     The Fourteenth Amendment to the United States Constitution provides that, "[n]o state shall…deny to any person within its jurisdiction the equal protection of the laws."

86.     Plaintiffs are citizens of the United States.

87.     Defendants were state actors acting under color of state law.

88.     Defendants had a duty to protect John Doe from harm and failed, through their reckless actions, to do so.

89.     Defendants denied equal protection of the law and discriminated against Plaintiffs based on national origin by denying repeated requests for the bus video.

90.     Defendants denied equal protection of the law and discriminated against Plaintiffs based on national origin by directing the interpreter to cease all communications with the family.

91.     Defendants denied equal protection of the law and discriminated against John Doe based on disability by failing to provide an interpreter, safe transportation and access to investigation records and the bus video.

92.     Defendants denied equal protection of the law and discriminated against John Doe and his Parents based on disability by failing to provide John Doe, a student with a disability, with a free and appropriate public education.

93.     Pursuant to 42 U.S.C. §1988, Plaintiff is entitled to recover all reasonable attorney's fees and costs expended in this action.

94.     As a direct and proximate result of Defendants' actions and inactions, John Doe and Parents have sustained injuries and damages, including, but not limited to, loss of their fundamental constitutional rights; economic loss; mental and emotional distress, including anxiety, mental anguish, humiliation, and embarrassment; psychological damage; and loss of the ordinary pleasures of everyday life.

## COUNT III

**Violation of Right to Bodily Integrity
Under the Fourth and Fourteenth Amendments to the U.S. Constitution,
*via* 42 U.S.C. §1983**

95.     Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as if fully set forth herein.

96.     At all times relevant herein Plaintiff John Doe had a right to bodily integrity which is protected by the Fourth Amendment, as well as by the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

97.     Defendants were state actors acting under the color of state law.

98.     Defendants had a duty to protect John Doe from harm and failed, through their reckless and intentional actions, to do so.

99.     Plaintiffs hereby plead this Count in the alternative to the facts known by Plaintiffs at the present, pursuant to Fed.R.Civ.P. 8(c), by alleging that John Doe was indeed harnessed to a bus seat and unaccompanied and/or harmed physically on the afternoon of February 16, 2023. Further discovery will reveal the extent of Defendants' reckless and intentional actions.

100.     Defendants violated John Doe's right by recklessly failing to follow its own policies pertaining to busing students, and by failing to follow the specific transportation plan for John Doe.

101.     Defendants recklessly failed to follow their own policies, procedures and protocols in assuring that buses are clear of all students when ending routes.

102.     As a result, John Doe was neglected, abused and/or injured.

103.     Pursuant to 42 U.S.C. §1988, Plaintiff is entitled to recover all reasonable attorney's fees and costs expended in this action.

104.    As a direct and proximate result of Defendants' actions and inactions, John Doe has sustained injuries and damages, including, but not limited to, loss of their fundamental constitutional rights; economic loss; mental and emotional distress, including anxiety, mental anguish, humiliation, and embarrassment; psychological damage; and loss of the ordinary pleasures of everyday life.

## COUNT IV

**Violation of the Americans with Disabilities Act, 42 U.S.C. § 12131 *et seq*.**

105.    Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

106.    John Doe is an "individual with a disability" within the meaning of the ADA. His disability substantially limits one or more major life activities, including learning, reading, concentrating, thinking, and communicating. 42 U.S.C. § 12102. (l)(2).

107.    Defendant RCS is a board of education operating a public school and is therefore a public entity subject to Title II of the ADA.

108.    As a school-age child who lives in the RCS school district in Franklin County, Ohio, John Doe is qualified to participate in Defendant RCS's educational programs and services.

109.    Defendant RCS is responsible for administering and/or supervising RCS's services, programs, and activities for children with disabilities.

110.    By the acts and omissions alleged herein, RCS and Defendant Pollock discriminated against John Doe in violation of Title II of the ADA, 42 U.S.C. §12131 *et seq*., and its implementing regulations on the basis of disability by:

  a.  denying him an educational opportunity that is equal to the opportunity afforded other children, §104.4(b)(1)(ii);

b. denying his educational services that are as effective as the services provided to other children, §104.4(b)(1)(iii);

c. utilizing methods of administration that have the effect of subjecting his to discrimination on the basis of disability, have the effect of substantially impairing accomplishment of its objectives for students with disabilities, and perpetuate the discrimination of bus transportation staff against these children, §104.4(b)(4); and

d. denying him an equal opportunity to participate in non-academic and extracurricular services and activities, §104.37.

111. As a direct and proximate result of the Defendants' actions and inactions, John Doe has sustained injuries and damage, including, but not limited to, loss of his fundamental constitutional rights; economic loss; mental and emotional distress, including anxiety, mental anguish, humiliation, and embarrassment; psychological damage; and loss of the ordinary pleasures of everyday life.

## COUNT V

**Violation of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, *et seq*.**

112. Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

113. John Doe is an "otherwise qualified individual with a disability" within the meaning of Section 504. 29 U.S.C. §§ 794, 705(20).

114. As a school-age child who lives in Franklin County, John Doe is qualified to participate in RCS's educational programs and services.

115. Defendant RCS is a recipient of federal financial assistance subject to Section 504.

116.     Defendant RCS is responsible for administering and/or supervising RCS's services, programs, and activities for children with disabilities.

117.     By the acts and omissions alleged herein, Defendant RCS has discriminated against John Doe in violation of Section 504, and its implementing regulations solely on the basis of disability, by:

a.   failing to provide his with a free appropriate public education, including special education and related aids and services that are designed to meet his needs as adequately as the needs of nondisabled children are met and that adhere to the procedural safeguards set forth in Section 504, 34 C.F.R. §104.33;

b.   denying him an educational opportunity that is equal to the opportunity afforded other children, §104.4(b)(1)(ii);

c.   denying his educational services that are as effective as the services provided to other children, §104.4(b)(1)(iii);

d.   utilizing methods of administration that have the effect of subjecting his to discrimination on the basis of disability, have the effect of substantially impairing accomplishment of its objectives for students with disabilities, , §104.4(b)(4); and

e.   denying him an equal opportunity to participate in non-academic and extracurricular services and activities, §104.37.

118.     As a direct and proximate result of Defendants' actions and inactions, John Doe has sustained injuries and damages, including, but not limited to, loss of their fundamental constitutional rights; economic loss; mental and emotional distress, including anxiety, mental anguish, humiliation, and embarrassment; psychological damage; and loss of the ordinary

pleasures of everyday life. psychological trauma, Plaintiffs are seeking special damages in an amount to be proven at trial.

<u>**COUNT VI**</u>

**Intentional Infliction of Emotional Distress**

119.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as if fully set forth herein.

120.    RCS and Pollock intended to or recklessly caused Plaintiffs serious emotional distress.

121.    Defendants' conduct was extreme and outrageous.

122.    Defendants' conduct was the proximate cause of Plaintiffs' serious emotional distress.

123.    Defendants caused Plaintiffs' serious emotional distress by recklessly allowing John Doe to be strapped into a harness on an unattended bus for up to 6 hours, by failing to investigate the whereabouts of John Doe while he was unaccounted for, by intentionally misleading Parents about the fact that an investigation was conducted, by destroying or allowing deletion of video evidence, and by failing to ensure his safe transport to and from RCS Preschool.

124.    Defendants acted recklessly, in conscious disregard of, or deliberately indifferent to a known or obvious risk of harm to another that was unreasonable under the circumstances and is substantially greater than negligent conduct.

125.    Defendants recklessly failed to follow their own policies, procedures and protocols in assuring that buses are clear of all students when ending routes and parking buses at the bus garage.

126.   Any reasonable person in Defendants' positions would have knowledge that such misconduct would inflict serious emotional damage upon Plaintiffs. Defendants' conduct was objectively extreme and outrageous.

127.   As a direct and proximate result of Defendants' egregious conduct inflicted upon Plaintiff John Doe and Parents, they have suffered and continue to suffer significant emotional distress, loss of their fundamental constitutional rights; economic loss; mental and emotional distress, including anxiety, mental anguish, humiliation, and embarrassment; psychological damage; and loss of the ordinary pleasures of everyday life.

128.   This conscious disregard and knowledge of the risk of harm posed to Plaintiffs under the supervision of RCS transportation department is deeply unreasonable and goes beyond mere negligence.

129.   This conscious disregard by RCS, coupled with the recklessly indifferent response to Parents' repeated requests to have an investigation of the events of that day and to view the bus video was extreme and outrageous.

130.   Defendant's actions in failing to investigate and intentionally destroying the bus video was the proximate cause of Plaintiff's mental and emotional injuries that resulted from Defendants' reckless conduct and outrageous misconduct.

131.   The injuries inflicted by the above-named Defendants were of a nature that no reasonable person in Plaintiffs' position should be expected to endure.

132.   Plaintiffs are entitled to damages for the emotional harm he suffered as detailed in the preceding paragraphs.

## COUNT VII

### Assault

133.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as if fully set forth herein.

134.    Defendants acted with the intention to cause harmful or offensive contact.

135.    Plaintiff was touched in a harmful or offensive manner or threatened to be touched in a harmful or an offensive manner. The actions of RCS and its employees caused physical harm to John Doe, as he was physically restrained for a prolonged period.

136.    This action by Defendants, in leaving John Doe strapped on the bus unattended for an extended period of time, constitutes a prohibited "mechanical restraint" under Ohio Administrative Code Rule 3301-35-15.

137.    Plaintiff John Doe did not consent to the conduct.

138.    Plaintiffs hereby plead this Count in the alternative to the facts known by Plaintiffs at the present, pursuant to Fed.R.Civ.P. 8(c), by alleging that John Doe was indeed unaccompanied and harnessed to a bus seat and/or harmed physically on the afternoon of February 16, 2023. Further discovery will reveal the extent of Defendants' reckless and unconstitutional actions.

139.    RCS had custody and control over John Doe, a child under eighteen years of age with a disability.

140.    Defendants recklessly failed to follow their own policies, procedures and protocols in assuring that buses are clear of all students when ending routes.

141.    Defendants' assault of Plaintiff caused Plaintiff to suffer significant emotional damage that continues to date, including, but not limited to, emotional distress, loss of their fundamental constitutional rights; economic loss; mental and emotional distress, including anxiety, mental anguish, humiliation, and embarrassment; psychological damage; and loss of the ordinary pleasures of everyday life.

## <u>COUNT VIII</u>

### Negligent Supervision of Student

142.    Plaintiffs reallege and incorporate by reference each of the paragraphs written above as if fully set forth herein.

143.    Defendants recklessly supervised John Doe, a nonverbal student with autism.

144.    Defendants owed Plaintiffs a duty of care to assure John Doe's safety in school and on school-provided transportation.

145.    Defendants' breach of this duty led to John Doe's injury.

146.    The Defendants knew or could have prevented such harm through the exercise of reasonable care, including by following its policies and procedures, conducting an investigation, preserving the bus video, and communicating effectively with Parents.

147.    As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered and continue to suffer significant emotional distress, loss of their fundamental constitutional rights; economic loss; mental and emotional distress, including anxiety, mental anguish, humiliation, and embarrassment; psychological damage; and loss of the ordinary pleasures of everyday life.

## <u>COUNT IX</u>

### Spoliation of Evidence

148.    Plaintiffs reallege and incorporate by reference each of the preceding paragraphs as if fully set forth herein.

149.    Defendants were aware of pending or probable litigation involving Plaintiffs based on Parents repeated requests for an investigation and for a copy of the bus video.

150.    Defendants were legally obligated to preserve the records once a request was made pursuant to 34 C.F.R. §99.10(e)("The educational agency or institution…shall not destroy any education records if there is an outstanding request to inspect and review the records under this section") and Ohio Revised Code §3319.321 (the Ohio Student Records Law).

151.    Parents repeatedly asked, *via* their interpreter, for an investigation into John Doe's whereabouts and for a copy of the bus video.

152.    Defendants thereafter removed the Parents' ability to communicate by Pollock's instruction to the RCS interpreter to cease all communications with the Parents.

153.    Defendants' willful destruction of evidence was designed to disrupt the Plaintiffs' knowledge of the matter.

154.    This destruction of the video disrupted Plaintiffs' case, as the video would have revealed where John Doe was and what happened to him that afternoon.

155.    The destruction by Defendants proximately caused damages to Plaintiffs.

156.    Defendants' intentional spoliation of evidence caused Plaintiffs to suffer significant emotional damage that continues to date, including, but not limited to, emotional distress, loss of their fundamental constitutional rights; economic loss; mental and emotional distress, including anxiety, mental anguish, humiliation, and embarrassment; psychological damage; and loss of the ordinary pleasures of everyday life.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief as follows:

1. A jury trial for all issues pursuant to F.R.C.P. 38(b);

2. That each Defendant be required to answer within the time prescribed by law;

3. A declaration that the acts and conduct of all Defendants constitute violations of Plaintiff's constitutional, statutory, and common-law rights;

4. An award to Plaintiffs against all Defendants, jointly and severally, an appropriate amount of compensatory and punitive damages;

5. Equitable relief forcing Defendants to enact and follow policies to protect students in attendance from harassment, abuse, and discriminatory conduct.

6. An award to Plaintiffs against all Defendants, jointly and severally, reimbursement for appropriate court costs and reasonable attorney fees;

7. An award to Plaintiffs for any other relief the court deems appropriate.

Respectfully submitted,

*/s/ Ruth Pack-Adler, Esq.*
Ruth Pack-Adler (0067446)
Mark. A. Weiker (0086413)
ABDNOUR WEIKER, L.L.P.
262 South 3rd Street
Columbus, Ohio 43215
T: (614) 745-2001
F: (614) 417-5081
E: ruth@awlawohio.com
E: mark@awlawohio.com
*Counsel for Plaintiffs*

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

*/s/ Ruth Pack-Adler, Esq.*
Ruth Pack-Adler (0067446)