UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

JOHN DOE, *et al.*,

      Plaintiffs,

      v.

REYNOLDSBURG CITY SCHOOL
DISTRICT BOARD OF EDUCATION, *et al.*,

      Defendants.

Case Number 2:25-cv-138
JUDGE EDMUND A. SARGUS, JR.
Magistrate Judge S. Courter M. Shimeall

## OPINION AND ORDER

This matter is before the Court on the Motion for Judgment on the Pleadings filed by

Defendants Reynoldsburg City School District Board of Education, Tracey Reed, Greg Pollock,

and Jacob Wilhite. (ECF No. 19.) Plaintiffs John Doe, Parent 1, and Parent 2 responded in

opposition (ECF No. 28) and Defendants replied in support (ECF No. 33). For the reasons

below, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' Motion for

Judgment on the Pleadings. (ECF No. 19.)

## BACKGROUND

### I.    Factual Background

The Court summarizes the facts as alleged in Plaintiffs' Amended Complaint because the

Court accepts those allegations as true for purposes of Defendants' Motion for Judgment on the

Pleadings.

###     A.    Plaintiffs John Doe, Parent 1, and Parent 2

Plaintiff John Doe is a nonverbal child diagnosed with autism spectrum disorder. (ECF

No. 8, ¶ 28.) He was six years old when the events underlying this lawsuit transpired. (*Id.*) John

Doe attended a preschool operated by the Reynoldsburg City School District Board of Education

("RCS") until February 17, 2023, and received special education and related services from RCS. (*Id.* ¶¶ 2, 28, 80.) John Doe's parents—Plaintiffs Parent 1 and Parent 2—are of Nepali descent and are native Nepali speakers. (*Id.* ¶¶ 4, 119.) Parent 1, John Doe's father, has limited English proficiency and Parent 2, John Doe's mother, cannot speak or understand English. (*Id.* ¶¶ 4, 19.) They rely on Mukti Rijal, an RCS family liaison and interpreter, to communicate with RCS. (*Id.* ¶¶ 47, 82.)

John Doe's transportation needs are detailed in his individualized education plan, which requires "accommodations or modifications for transportation" and the use of a "securement system." (*Id.* ¶ 34.) Parents 1 and 2 regularly observed RCS staff secure John Doe into his harness on the school bus on the way to school and release him from the harness when he arrived at home. (*Id.* ¶ 35.) The typical RCS preschool day begins at 1:00 p.m. and ends at 4:15 p.m. (*Id.* ¶ 36.) John Doe rode Bus #13 to school each day, boarding around 12:49 p.m., and rode Bus #52 home, returning around 4:30 p.m. (*Id.* ¶¶ 36–37.) John Doe lives a four-minute drive from the RCS preschool and was the first student the bus dropped off at the end of each day. (*Id.* ¶¶ 38–39.)

### B. The February 16, 2023 Incident

On February 16, 2023, Parent 2 escorted John Doe from their home to Bus #13 at approximately 12:49 p.m. (*Id.* ¶ 40.) John Doe was harnessed into his securement system by an aide or the bus driver. (*Id.*) Parents 1 and 2 later learned that RCS official attendance records showed John Doe was marked absent from school that day. (*Id.* ¶¶ 41, 71.) After the school day, at approximately 4:17 p.m., an unknown preschool teacher helped the preschool students board Bus #1. (*Id.* ¶ 42.) John Doe typically rode Bus #52 home from school, but the Bus #52 driver was unavailable on February 16, 2023, so Phyllis Mayberry, a substitute bus driver, drove the

Bus #52 students home on Bus #1 that day. (*Id.* ¶¶ 37, 42) The unknown preschool teacher advised Ms. Mayberry that John Doe was absent from school. (*Id.* ¶¶ 43–44.)

John Doe did not arrive home at the expected time of 4:30 p.m., and Parents 1 and 2 did not receive a notification from RCS about transportation delays, as they typically did when delays occurred. (*Id.* ¶¶ 45–46.) Parent 1 called the RCS preschool, transportation department, and bus garage numerous times, but no one answered. (*Id.* ¶¶ 53–54.) Parent 1 drove to the preschool at 5:00 p.m. to try to find John Doe, and met an unknown teacher in the parking lot, who told Parent 1 that she was the only person left in the building and recommended that Parent 1 return home to wait for John Doe's arrival. (*Id.* ¶¶ 55–56.) Parent 1 went home and called the Reynoldsburg Police Department to report John Doe as missing at 5:24 p.m. (*Id.* ¶¶ 57–58.)

Reynoldsburg Police Officer Emily Coackley arrived at the family's home and interviewed Parents 1 and 2. (*Id.* ¶ 59.) She called the preschool and bus garage, but no one answered. (*Id.* ¶ 60.) She instructed the dispatcher to send another officer to the bus garage to check for John Doe. (*Id.* ¶ 61.) At approximately 5:48 p.m., Officer Coackley received a radio call from another officer, Officer Carlton Davis, who indicated that John Doe was on Bus #1 and heading home. (*Id.* ¶ 62.) It is unknown how Officer Davis learned that John Doe was on Bus #1 or if he saw John Doe or anyone from RCS at the bus garage. (*Id.* ¶ 63.)

Bus #1 arrived in front of a neighbor's home at 5:49 p.m. (*Id.* ¶ 65.) John Doe was still strapped in his harness. (*Id.* ¶ 66.) Officer Coackley boarded the bus, spoke to Ms. Mayberry, and escorted John Doe off the bus. (*Id.* ¶¶ 66–67.) John Doe appeared confused and upset and ran towards a neighbor's house, and Parent 1 ran after him and brought him home. (*Id.* ¶¶ 68–69.)

### C. The Aftermath of the February 16, 2023 Incident

Later that night, Parent 1 contacted Mr. Rijal to ask for help requesting that RCS investigate the incident and provide video footage from the bus. (*Id.* ¶ 76.) Mr. Rijal assured Parent 1 that he would speak to the proper RCS personnel about those requests. (*Id.* ¶ 77.)

Beginning on February 17, 2023, Parents 1 and 2 stopped sending John Doe to RCS preschool due to concerns for his well-being. (*Id.* ¶ 80.) Because RCS personnel were unavailable during the incident and failed to adequately explain what happened to John Doe, Parents 1 and 2 worried that if they sent John Doe back to RCS preschool, he would suffer more harm. (*Id.*)

Parents 1 and 2 requested that RCS investigate the incident and provide a copy of the bus video on multiple occasions. (*See, e.g.*, *id.* ¶ 81.) Mr. Rijal informed Parent 1 that a meeting with RCS preschool was set for February 17, 2023, but RCS cancelled the meeting without explanation. (*Id.* ¶ 83.) In a subsequent email, Jennifer Stewart, the Interim Preschool Coordinator, said the bus delay was likely due to the substitute bus driver's unfamiliarity with the route. (*Id.* ¶¶ 47, 85.) Parent 1, Mr. Rijal, Ms. Stewart, and Defendant Wilhite (the Director of Transportation at RCS) met to discuss the incident on February 22, 2023, and February 24, 2023. (*Id.* ¶¶ 26, 86–87, 89.) During those meetings, Defendant Wilhite and Ms. Stewart promised to investigate the incident and obtain a copy of the bus video, but did not provide follow-up communications on those matters. (*Id.* ¶¶ 87–93.)

Parents 1 and 2 continued asking for the bus video until March 7, 2023, when Defendant Pollock, the Executive Director of Business and Operations at RCS, informed them that he had only recently been made aware of the request and the bus video had been overwritten due to the lapse in time. (*Id.* ¶¶ 25, 97.) Plaintiffs allege that Defendant Pollock knew about the bus

incident on February 17, 2023, and was reminded of their bus video request in several emails and meetings thereafter. (*Id.* ¶¶ 98–99.)

On March 10, 2023, Defendant Pollock emailed Mr. Rijal and several RCS administrators, stating that a full investigation had been conducted and that John Doe had never been in danger. (*Id.* ¶ 100.) Parents 1 and 2 did not receive documentation of this investigation, despite requesting that information from RCS. (*Id.* ¶ 101.) Defendant Pollock's email also included the following statements directed to Mr. Rijal:

> Please do not reach out or communicate with the parent on my behalf or on the behalf of anyone you copied on the email, nor further share the contents of this email with the parent without my consent. I have communicated and provided my contact information should the parent have a need to convey concerns moving forward.

(*Id.* ¶ 102.) As such, Mr. Rijal stopped communicating with Parents 1 and 2. (*Id.* ¶ 103.) Plaintiffs allege that, because of Defendants' instructions to Mr. Rijal and the fact that RCS does not have another Nepali interpreter, they are unable to effectively communicate with RCS. (*Id.* ¶ 103.)

A few months after the incident, Parents 1 and 2 learned that RCS official attendance records showed John Doe was marked absent from school on February 16, 2023. (*Id.* ¶¶ 41, 71.) It remains unclear if John Doe was strapped in his harness on Bus #13 for the entire day. (*Id.* ¶ 72.)

Plaintiffs allege that John Doe suffered educational, psychological, behavioral, and developmental harm due to the February 16, 2023 incident and his inability to safely attend RCS preschool thereafter. (*Id.* ¶ 104.) Parents 1 and 2 homeschooled John Doe following the incident, but RCS later provided home-based instruction for John Doe. (*Id.* ¶¶ 110–11.)

## II.      Procedural Background

Plaintiffs John Doe, Parent 1, and Parent 2 commenced this action in February 2025 against Defendants Reynoldsburg City School District Board of Education and Greg Pollock, the Executive Director of Business and Operations at RCS. (ECF No. 1.) Plaintiffs brought claims under federal and state law arising out of the February 16, 2023 incident (*id.*), and Defendants subsequently moved to dismiss those claims (ECF No. 5). Plaintiffs John Doe, Parent 1, and Parent 2 then filed an Amended Complaint, naming as Defendants the Reynoldsburg City School District; the Reynoldsburg City School District Board of Education (together with the Reynoldsburg City School District, the "RCS Defendants"); Tracy Reed, in her individual capacity and official capacity as the Superintendent of RCS; Greg Pollock, in his individual capacity and official capacity as the Executive Director of Business and Operations at RCS; and Jacob Wilhite, in his individual capacity and official capacity as the Director of Transportation at RCS. (ECF No. 8, ¶¶ 21–26.)

The Amended Complaint sets forth the following federal claims: (1) violation of Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d, *et seq.*) brought by all Plaintiffs against the RCS Defendants and Defendants Reed and Pollock; (2) violation of the Equal Protection Clause of the Fourteenth Amendment brought under 42 U.S.C. § 1983 by all Plaintiffs against the RCS Defendants and Defendants Reed and Pollock, (3) violation of the right to bodily integrity under the Fourth and Fourteenth Amendments brought under 42 U.S.C. § 1983 by Plaintiff John Doe against the RCS Defendants and Defendants Reed, Pollock, and Wilhite; (4) failure to train and supervise brought under 42 U.S.C. § 1983 by all Plaintiffs against the RCS Defendants and Defendants Reed, Pollock, and Wilhite; (5) *Monell* liability brought under 42 U.S.C. § 1983 by all Plaintiffs against the RCS Defendants; (6) violation of the Americans with Disabilities Act

6

("ADA") (42 U.S.C. § 12131, *et seq.*) brought by Plaintiff John Doe against the RCS Defendants; and (7) violation of Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794, *et seq.*) brought by Plaintiff John Doe against the RCS Defendants. (*Id.* ¶¶ 112–86.)

The Amended Complaint also includes several state-law claims. All Plaintiffs assert claims for intentional infliction of emotional distress; negligence; negligent hiring, supervision, and retention; and spoliation of evidence against all Defendants. (*Id.* ¶¶ 187–93, 209–44.) In addition, Plaintiff John Doe brings an assault claim against the RCS Defendants. (*Id.* ¶¶ 194–208.)

In June 2025, Defendants filed a Motion for Judgment on the Pleadings (ECF No. 19), to which Plaintiffs responded in opposition (ECF No. 28) and Defendants replied in support (ECF No. 33). Defendants' Motion is ripe for review.

## LEGAL STANDARD

The Federal Rules of Civil Procedure provide that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). The legal standard for adjudicating a Rule 12(c) motion is the same as that for adjudicating a Rule 12(b)(6) motion. *Sharaydeh v. Warren County*, 730 F. Supp. 3d 692, 695 (S.D. Ohio 2024) (Barrett, J.) (citing *Lindsay v. Yates*, 498 F.3d 434, 437 n.5 (6th Cir. 2007)). Accordingly, the Court must "construe the complaint in the light most favorable to the nonmoving party, accept the well-pled factual allegations as true, and determine whether the moving party is entitled to judgment as a matter of law." *Barany-Snyder v. Weiner*, 539 F.3d 327, 332 (6th Cir. 2008) (quoting *Com. Money Ctr., Inc. v. Ill. Union Ins. Co.*, 508 F.3d 327, 336 (6th Cir. 2007)). The court "need not accept the plaintiff's legal conclusions or unwarranted factual inferences as true." *Id.* (quoting *Com. Money Ctr.*, 508 F.3d at 336). To withstand a Rule

7

12(c) motion for judgment on the pleadings, "a complaint must contain direct or inferential allegations respecting all the material elements under some viable legal theory." *Id.* (quoting *Com. Money Ctr.*, 508 F.3d at 336).

**ANALYSIS**

## I.      Defendant Reynoldsburg City School District

In their Amended Complaint, Plaintiffs added the Reynoldsburg City School District as a defendant. (ECF No. 8, ¶ 21.) Defendants request that all claims asserted against the Reynoldsburg City School District be dismissed because it is not an entity capable of being sued. (ECF No. 19, PageID 197–98.) Indeed, under Ohio law, a school district "does not exist and is not sui juris." *Est. of Olsen v. Fairfield City Sch. Dist. Bd. of Educ.*, 341 F. Supp. 3d 793, 799 (S.D. Ohio 2018) (Barrett, J.) (quoting *Mahdy v. Mason City Sch. Dist.*, No. 1:16-CV-845, 2017 WL 25504, at *2 (S.D. Ohio Jan. 3, 2017) (Black, J.)). The entity with the capacity to sue and be sued is the board of education of the school district. *Id.*; Ohio Rev. Code § 3313.17. Plaintiffs sued the Reynoldsburg City School District Board of Education in addition to the Reynoldsburg City School District. (ECF No. 8, ¶¶ 21–22.) And Plaintiffs concede that Reynoldsburg City School District, as a standalone entity, is incapable of being sued. (ECF No. 28, PageID 254.) Therefore, the Court grants Defendants' Motion for Judgment on the Pleadings with respect to claims asserted against Defendant Reynoldsburg City School District.

In their Amended Complaint, Plaintiffs refer to the Reynoldsburg City School District and the Reynoldsburg City School District Board of Education collectively as the RCS Defendants. (ECF No. 8, ¶ 23.) The Court continues to use the abbreviation "RCS" for consistency, but the Court's use of "RCS" below refers only to the Reynoldsburg City School District Board of Education as the Reynoldsburg City School District is dismissed.

8

**II.      Claims Under Title II of the ADA and Section 504 of the Rehabilitation Act**

John Doe asserts claims against RCS under Title II of the Americans with Disabilities Act (42 U.S.C. § 12131, *et seq.*) and Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794, *et seq.*). (ECF No. 8, ¶¶ 174–86.)

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from the participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Similarly, Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). The only distinctions between the statutes are Section 504's "limitation to denials of benefits 'solely' by reason of disability and its reach of only federally funded—as opposed to 'public'—entities." *S.S. v. E. Ky. Univ.*, 532 F.3d 445, 452–53 (6th Cir. 2008). Both Acts allow disabled individuals to sue school districts that exclude them from participation in, deny them benefits of, or discriminate against them in a program because of their disability. *Gohl v. Livonia Pub. Schs. Sch. Dist.*, 836 F.3d 672, 681 (6th Cir. 2016). Given the similarities between the two statutes, courts often merge the analyses. *Qiu v. Univ. of Cincinnati*, 803 F. App'x 831, 836 (6th Cir. 2020).

**A.      Administrative Exhaustion Requirements**

Defendants argue that John Doe's ADA and Section 504 claims fail because John Doe did not exhaust mandatory administrative requirements. (ECF No. 19, PageID 206–08.) John Doe did not plead a separate cause of action under the Individuals with Disabilities Education

9

Act ("IDEA"), but Defendants argue that his ADA and Section 504 claims include allegations related to the denial of a free appropriate public education, known as a "FAPE," so John Doe was required to exhaust his administrative remedies under the IDEA. (*Id.*)

The IDEA ensures that children with disabilities receive necessary special education services. *Fry v. Napoleon Cmty. Sch.*, 580 U.S. 154, 157 (2017); *see generally* IDEA, 20 U.S.C. § 1400, *et seq.* The statute offers federal funds to States in exchange for furnishment of a FAPE to all children with certain physical or intellectual disabilities. *Fry*, 580 U.S. at 158. A FAPE must include both "'instruction' tailored to meet a child's 'unique needs'" and "sufficient 'supportive services' to permit the child to benefit from that instruction." *Id.* (quoting 20 U.S.C. §§ 1401(9), (26), (29)). When a lawsuit is predicated on the denial of a FAPE, the IDEA's administrative exhaustion requirements generally apply. *See id*. at 168 (citing 20 U.S.C. § 1415(*l*)). This is true even when the plaintiff's claims are brought under a different statute— such as the ADA or the Rehabilitation Act—rather than directly under the IDEA. *Id.*

Plaintiffs do not dispute that their ADA and Section 504 claims are premised on the denial of a FAPE. (ECF No. 28, PageID 270 ("Doe was denied the benefit of free and appropriate public education by RCS's failure to keep him safe.").) Instead, they argue that administrative exhaustion was not required because they seek compensatory damages, which are not available under the IDEA. (*Id.*) In *Luna Perez v. Sturgis Public Schools*, 598 U.S. 142 (2023), the Supreme Court crafted an exception to the IDEA's administrative exhaustion requirement. Even though the plaintiff's claim was entangled with the defendant's alleged past failure to provide a FAPE, the Supreme Court held that the IDEA's administrative exhaustion requirements did not apply because they only cover suits that seek relief also available under the

10

IDEA, and the plaintiff sued for compensatory damages, which are not available under the IDEA. *Id.* at 147–48.

Here, Plaintiffs request compensatory damages in the Prayer for Relief section of their Amended Complaint and do not tie that request to any particular claim. (ECF No. 8, PageID 109.) Given this ambiguity, and drawing reasonable inferences in John Doe's favor, the Court presumes he seeks backward-looking relief in the form of compensatory damages in connection with his ADA and Section 504 claims. *See Doe v. Ohio Hi-Point Sch. Dist. Bd. of Educ.*, 716 F. Supp. 3d 575, 603 (S.D. Ohio 2024). This relief is unavailable under the IDEA, so the Court declines to dismiss John Doe's ADA and Section 504 claims based on a failure to exhaust administrative remedies and proceeds to examine the merits of those claims.

**B.      Failure to State a Claim**

Defendants argue that the allegations related to John Doe's Title II and Section 504 claims are conclusory and insufficient to state a claim. (ECF No. 19, PageID 209.) To plead a claim under Title II of the ADA or Section 504 of the Rehabilitation Act, John Doe must allege plausible facts giving rise to an inference that he was subject to discrimination by reason of his disability. *Li v. Revere Loc. Sch. Dist.*, No. 21-3422, 2023 WL 3302062, at \*12 (6th Cir. May 8, 2023). He must plead that he is (1) disabled under the statutes, (2) otherwise qualified for participation in the program, and (3) being excluded from participation, and denied the benefits of, or subjected to discrimination under the program by reason of his disability. *S.S. v. E. Ky. Univ.*, 532 F.3d at 453. John Doe must allege that RCS "disregarded a 'strong likelihood' that the

11

challenged action would 'result in a violation of federally protected rights.'"[1] *A. J. T. by & through A. T. v. Osseo Area Schs., Indep. Sch. Dist. No. 279*, 605 U.S. 335, 344–45 (2025).

There is no dispute that John Doe is a qualifying individual under the ADA and Section 504. (ECF No. 19, PageID 208.) But Defendants argue that the vague allegations in the Amended Complaint are insufficient to state a claim under those statutes, particularly because John Doe had a valid individualized education plan with RCS. (ECF No. 19, PageID 209.)

Here, John Doe's ADA and Section 504 claims are premised on the idea that RCS denied him a FAPE by precluding him from safely attending school. (ECF No. 28, PageID 270–71; *see* ECF No. 8, ¶¶ 80, 106.) While the mere denial of a FAPE is insufficient to state an ADA or Section 504 claim, the Amended Complaint alleges more. Plaintiffs allege that Defendants failed to adequately supervise John Doe on the day they lost him and failed to investigate and document the circumstances surrounding John Doe's disappearance to ensure he was never lost again. (ECF No. 8, ¶ 3.) Parents 1 and 2 could not reach RCS personnel on February 16, 2023, and RCS has been unable to adequately explain what happened to John Doe on that day. (*Id.* ¶ 80.) Plaintiffs also allege that they asked RCS to investigate the February 16, 2023 incident and share a copy of the bus video on multiple occasions, but RCS failed to provide documentation of their investigation and failed to preserve the bus video. (*Id.* ¶¶ 94, 101.) For these reasons,

---

[1] In *A. J. T. by & through A. T. v. Osseo Area Schools, Independent School District No. 279*, 605 U.S. 335 (2025), the Supreme Court rejected the previous requirement that students bringing ADA and Rehabilitation Act claims relating to their education show that the defendant acted in bad faith or with gross misjudgment. *Id.* at 344–45. The Supreme Court explained that "ADA and Rehabilitation Act claims based on educational services should be subject to the same standards that apply in other disability discrimination contexts." *Id.* at 345. As such, a plaintiff must now show that the defendant "disregarded a 'strong likelihood' that the challenged action would 'result in a violation of federally protected rights.'" *Id.*

Plaintiffs allege that RCS prevented John Doe from attending school safely and denied him access to education.

In light of these allegations, the Court concludes that John Doe's ADA and Section 504 claims are premised on more than the mere denial of a FAPE and are based on RCS's alleged disregard for a strong likelihood that its actions would result in a violation of federally protected rights. As such, the Court denies Defendants' Motion for Judgment on the Pleadings with respect to John Doe's ADA and Section 504 claims.

### III. Claims Under 28 U.S.C. § 1983

Next, the Court examines the four claims that Plaintiffs bring under 42 U.S.C. § 1983. Section 1983 provides a "statutory cause of action for the deprivation of federal rights, privileges, or immunities by those acting under color of state law." *M.J. by & through S.J.*, 1 F.4th at 448. First, all Plaintiffs bring a claim for denial of equal protection under the Fourteenth Amendment against RCS and Defendants Reed and Pollock. (ECF No. 8, ¶¶ 135–42.) Second, John Doe brings a claim for violation of the right to bodily integrity under the Fourth and Fourteenth Amendments against all Defendants. (*Id.* ¶¶ 143–54.) Third, all Plaintiffs bring a claim for failure to train and supervise against all Defendants. (*Id.* ¶¶ 155–64.) Fourth, all Plaintiffs bring a claim for *Monell* liability against RCS. (*Id.* ¶¶ 165–73.) Because *Monell* is a theory of liability, rather than an independent cause of action, the Court will construe Plaintiffs' *Monell* claim as their theory of liability against RCS for the remaining § 1983 claims. *See Ohio Hi-Point Sch. Dist. Bd. of Educ.*, 716 F. Supp. 3d at 607.

#### A. Defendant RCS

With respect to Plaintiffs' § 1983 claims against RCS, a local government "may not be sued under § 1983 for an injury inflicted solely by its employees or agents." *Monell v. Dep't of*

13

*Soc. Servs. of New York*, 436 U.S. 658, 694 (1978). Instead, RCS may be liable in a § 1983 action only if Plaintiffs "can establish that an officially executed policy, or the toleration of a custom within the school district leads to, causes, or results in the deprivation of a constitutionally protected right." *Doe v. Claiborne County*, 103 F.3d 495, 507 (6th Cir. 1996) (citing *Monell*, 436 U.S. at 690–91). A policy or custom may be established by demonstrating: "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013).

In their Complaint, Plaintiffs allege that "Defendant Pollock's failure to comply with Title VI amounts to an official policy of inaction." (ECF No. 8, ¶ 171.) In their response brief, Plaintiffs add that Defendants' failure to investigate or report the disappearance of John Doe constitutes a custom or practice for purposes of *Monell*. (ECF No. 28, PageID 272–73.)

To assert a § 1983 claim under *Monell* based on inaction or an inadequate investigation, a plaintiff must allege "a clear and persistent" pattern of unconstitutional conduct by municipal employees. *D'Ambrosio v. Marino*, 747 F.3d 378, 387–88 (6th Cir. 2014); *Pineda v. Hamilton County*, 977 F.3d 483, 495 (6th Cir. 2020). Plaintiffs have not done so here. Instead, they allege that Defendant Pollock failed to comply with Title VI on one occasion—the one at issue in this lawsuit. Likewise, Plaintiffs' position that Defendants failed to investigate or report the disappearance of John Doe is insufficient to allege liability under *Monell*. Although Plaintiffs allege various failures—such as Defendants' failure to provide an incident report or a bus video—these allegations arise out of a single incident and do not constitute a clear and persistent

14

pattern of unconstitutional conduct as contemplated by *Monell*. Therefore, Defendants' Motion

for Judgment on the Pleadings is granted as to Plaintiffs' § 1983 claims against RCS.

### B. Defendants Reed, Pollock, and Wilhite in Their Official Capacities

Next, the Court turns to Plaintiffs' § 1983 claims against Defendants Reed, Pollock, and

Wilhite in their official capacities.

Suing a government employee in his or her official capacity "generally represent[s] only

another way of pleading an action against an entity of which an officer is an agent." *Kouider on*

*Behalf of Y.C. v. Parma City Sch. Dist. Bd. of Educ.*, 480 F. Supp. 3d 772, 780 (N.D. Ohio 2020)

(quoting *Kentucky v. Graham*, 473 U.S. 159, 165 (1985)). When a government entity is also

named as a defendant, along with the government official in his or her official capacity, federal

courts will dismiss the official capacity claim. *Id.*; *see also Johnson v. Wash. Cnty. Career Ctr.*,

No. 2:10-cv-076, 2010 WL 2570929, at *4 (S.D. Ohio June 22, 2010) (Smith, J.) ("Courts

regularly dismiss as redundant claims against agents in their official capacities when the

principal entity is also named as a defendant in the suit.").

Here, Plaintiffs bring § 1983 claims against Defendants Reed, Pollock, and Wilhite in

their individual and official capacities. Plaintiffs assert those claims against RCS, too. Given that

any wrongdoing by the individual defendants in their official capacities is attributable to RCS,

the official-capacity § 1983 claims against Defendants Reed, Pollock, and Wilhite are redundant

of the claims against RCS. As such, Defendants' Motion for Judgment on the Pleadings is

granted with respect to the § 1983 claims asserted against Defendants Reed, Pollock, and Wilhite

in their official capacities.

15

**C.**     **Defendants Reed, Pollock, and Wilhite in Their Individual Capacities**

Finally, the Court addresses Plaintiffs' § 1983 claims against Defendants Reed, Pollock, and Wilhite in their individual capacities.

**A.**     **Equal Protection Under the Fourteenth Amendment Against Defendants Reed and Pollock**

Plaintiffs assert an equal protection claim under the Fourteenth Amendment based on national origin discrimination against Defendants Reed and Pollock in their individual capacities. (ECF No. 8, ¶¶ 135–42.) The Equal Protection Clause of the Fourteenth Amendment provides that a State may not "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. "To state a claim under the Equal Protection Clause, a § 1983 plaintiff must allege that a state actor intentionally discriminated against the plaintiff because of membership in a protected class." *Henry v. Blank*, 167 F.4th 375, 380 (6th Cir. 2026) (quoting *Midkiff v. Adams Cnty. Reg'l Water Dist.*, 409 F.3d 758, 770 (6th Cir. 2005)).

Plaintiffs allege that Defendants discriminated "based on national origin by directing [Mr.] Rijal to cease all communications with them, knowing that they had no other way of communicating with the school and accessing information about John Doe's education and what had happened to him on February 16, 2023." (ECF No. 8, ¶ 138.)

With respect to Defendant Reed, Plaintiffs do not allege that she was personally involved in communicating with Mr. Rijal. Instead, they allege that she was the Superintendent of RCS, responsible for operations and oversight of the RCS district, and knew or should have known that RCS had a duty to provide Parents with an interpreter for all communications with RCS. (ECF No. 8, ¶¶ 117, 169.) When a plaintiff attempts to hold a school administrator individually liable for a constitutional injury caused directly by someone else, "supervisory liability" standards apply. *See Doe ex rel. Doe v. City of Roseville*, 296 F.3d 431, 439 (6th Cir. 2002) (quoting

*Claiborne County*, 103 F.3d at 513). To show supervisory liability, a plaintiff must allege, at a minimum, "that the official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999) (quoting *Hays v. Jefferson County*, 668 F.2d 869, 874 (6th Cir. 1982)). Plaintiffs have not alleged that Defendant Reed knew about Defendant Pollock's instructions to Mr. Rijal, so the Amended Complaint does not sufficiently plead an equal protection claim under § 1983 against Defendant Reed in her individual capacity. Defendants' Motion for Judgment on the Pleadings is granted on this claim.

By contrast, Plaintiffs allege that Defendant Pollock was personally involved in the alleged discrimination. Plaintiffs allege that Defendant Pollock discriminated against them based on national origin by sending an email to Mr. Rijal and several other RCS administrators directing Mr. Rijal to cease communicating with Parents and subsequently failing to provide an alternate Nepali interpreter to facilitate communication. (ECF No. 8, ¶¶ 9, 100, 102, 128.) Plaintiffs allege that this conduct prevented them from communicating with RCS staff about John Doe's education. (*Id.* ¶¶ 4, 122.)

As Defendants note, however, a § 1983 equal protection claim requires allegations that the plaintiff has been treated differently from others who are similarly situated. (ECF No. 19, PageID 213.) Plaintiffs have not included those allegations in their Amended Complaint. "To state an equal protection claim, a plaintiff must adequately plead that the government [treats certain people] disparately as compared to similarly situated persons and that such disparate treatment either burdens a fundamental right, targets a suspect class, or has no rational basis." *Raymond v. O'Connor*, 526 F. App'x 526, 530 (6th Cir. 2013) (quoting *Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 379 (6th Cir. 2011)). "The threshold element of an

equal protection claim is disparate treatment; once disparate treatment is shown, the equal protection analysis to be applied is determined by the classification used by government decision-makers." *Id.* (quoting *Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 260 (6th Cir. 2006)). Although Plaintiffs' Amended Complaint includes allegations related to Defendant Pollock's discriminatory conduct, it does not plausibly allege that Plaintiffs have been treated disparately. As such, their § 1983 equal protection claim, as currently plead, does not survive Defendants' Motion for Judgment on the Pleadings.

Rather than dismiss this claim with prejudice, however, the Court will dismiss it without prejudice and allow Plaintiffs an opportunity to file a motion for leave to amend (with a proposed Second Amended Complaint attached) for the limited purpose of attempting to plausibly allege a § 1983 equal protection claim against Defendant Pollock in his individual capacity. If Plaintiffs intend to file such a motion, they must do so within 30 days of this Order. Defendants may then file a response and Plaintiffs may file a reply within the time permitted by the Local Civil Rules. If Plaintiffs choose not to file a motion for leave to amend within 30 days, the dismissal of their § 1983 equal protection claim against Defendant Pollock in his individual capacity will automatically convert into a dismissal with prejudice.

### B. Right to Bodily Integrity under the Fourth and Fourteenth Amendments Against Defendants Reed, Pollock, and Wilhite

John Doe brings a § 1983 claim for violation of his right to bodily integrity under the Fourth and Fourteenth Amendments against Defendants Reed, Pollock, and Wilhite in their individual capacities. (ECF No. 8, ¶¶ 143–54.) He alleges that his right to bodily integrity was violated when he was "harnessed to a bus seat and unaccompanied, neglected, and/or harmed physically on the afternoon of February 16, 2023." (*Id.* ¶ 147.) John Doe does not allege that Defendants Reed, Pollock, and Wilhite were personally involved in this incident. Nor does John

18

Doe plausibly allege that those Defendants participated in, condoned, encouraged, or knowingly acquiesced in harnessing him into the bus seat where he was allegedly left unaccompanied, neglected, and/or physically harmed. *Shehee*, 199 F.3d at 300; *see also Myers v. Montgomery Cnty. Bd of Comm'rs*, No. 3:18-cv-00409, 2019 WL 2567748, at *4–5 (S.D. Ohio June 21, 2019) (Rose, J.) (dismissing § 1983 bodily integrity claim against the defendant in his individual capacity because the allegations in the Complaint did not show that the defendant encouraged the specific incident of misconduct or directly participated in it). As such, Defendants' Motion for Judgment on the Pleadings is granted with respect to John Doe's § 1983 bodily integrity claim against Defendants Reed, Pollock, and Wilhite in their individual capacities.

### C. Failure to Train and Supervise Against Defendants Reed, Pollock, and Wilhite

Plaintiffs bring a § 1983 claim for failure to train and supervise against Defendants Reed, Pollock, and Wilhite in their individual capacities. (ECF No. 8, ¶¶ 155–64.) Plaintiffs allege that Defendants failed to train and supervise staff to account for John Doe's whereabouts and appropriately investigate his disappearance. (*Id.* ¶ 159.) More specifically, Plaintiffs state that Defendants failed to train and supervise with respect to preserving video evidence from school buses, ensuring the safe removal of students from buses, establishing emergency contact procedures during after-hours emergencies, investigating John Doe's disappearance, providing interpreter services to individuals with limited English proficiency, and ensuring appropriate levels of staffing in the transportation department. (*Id.* ¶ 160.)

Through this claim, Plaintiffs seek to hold Defendants Reed, Pollock, and Wilhite liable in their supervisory capacity. But the Amended Complaint does not allege any personal involvement on behalf of Defendants Reed, Pollock, or Wilhite with respect to the

19

aforementioned supervision and training failures.[2] "An individual capacity claim based on supervisory liability, like all individual capacity claims, requires an allegation of personal liability." *Venema v. West*, 133 F.4th 625, 633 (6th Cir. 2025). The complaint must plead that the official violated the Constitution through his or her own actions. *Id.* Here, Plaintiffs do not set forth actions taken by the individual defendants that demonstrate their failure to train and supervise. Therefore, the allegations in the Amended Complaint are insufficient to state a viable § 1983 against Defendants Reed, Pollock, and Wilhite in their individual capacities for failure to train and supervise.[3]

## IV. Claim Under Title VI of the Civil Rights Act of 1964

Plaintiffs bring a claim under Title VI of the Civil Rights Act of 1964 against RCS and Defendants Reed and Pollock. (ECF No. 8, ¶¶ 112–34.) Title VI provides: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. Title VI applies to a recipient of federal funding, which includes a public educational entity. *Stanford v. Northmont City Sch. Dist.*, No. 3:19-cv-399, 2023 WL 1819117, at *8 (S.D. Ohio Feb. 8, 2023) (Newman, J.).

Plaintiffs allege that Defendants discriminated against them based on national origin by instructing Mr. Rijal to stop providing interpreter services and failing to appoint another Nepali-

---

[2] Plaintiffs allege that Defendant Pollock, himself, was responsible for the failure to provide interpreter services, and those allegations are addressed *supra* in this Court's analysis of Plaintiffs' § 1983 equal protection claim. However, the Amended Complaint does not include factual allegations as to how Defendant Pollock's failure to train or supervise led to the denial of interpreter services.

[3] At this time, Plaintiffs have not alleged a § 1983 claim against Defendants Reed, Pollock, or Wilhite in their individual capacities, so the Court need not address Defendants' alternate argument that they are entitled to qualified immunity for Plaintiffs' § 1983 claims.

speaking interpreter. (ECF No. 8, ¶¶ 9, 127.) Plaintiffs allege that, without an interpreter, they cannot communicate with the Reynoldsburg City School District and cannot safely send John Doe to school. (*Id.* ¶¶ 122, 131.)

The Court begins by addressing Defendants' argument that Parents 1 and 2 lack standing to bring a Title VI claim. (ECF No. 19, PageID 212.) Courts have explained that, to bring a Title VI claim, a plaintiff must be the intended beneficiary of a federally funded program, and the intended beneficiaries of a federally funded public school program are school children, not parents. *See, e.g.*, *Stanford*, 2023 WL 1819117, at *8 n.10; *Wheatley v. Boardman Loc. Schs., Dist. Bd. of Educ.*, No. 4:21-cv-1831, 2022 WL 2291703, at *6 (N.D. Ohio June 24, 2022). As such, the Court agrees with Defendants—the Title VI claims brought by Parents 1 and 2 are not viable.

Next, the Court turns to the Title VI claim against Defendants Reed and Pollock. Defendants argue that this claim necessarily fails because Title VI claims must be asserted against an entity, not an individual. (ECF No. 19, PageID 209–10.) Plaintiffs concede that an individual cannot be sued in his individual capacity under Title VI, but argue that they can assert this claim against Defendants Reed and Pollock in their official capacities. (ECF No. 28, PageID 277.) "A plaintiff may only assert Title VI claims against "the entity . . . receiving the financial assistance." *Foster*, 573 F. App'x at 389–90 (quoting *Buchanan v. City of Bolivar*, 99 F.3d 1352, 1357 (6th Cir. 1996)); *see also Stanford*, 2023 WL 1819117, at *8 (quoting *Brooks v. Skinner*, 139 F. Supp. 3d 869, 881 (S.D. Ohio 2015) (Litkovitz, M.J.)) ("In a [T]itle VI case, the proper defendant is 'the entity rather than an individual.'"). In addition, "[c]ourts regularly dismiss as redundant claims against agents in their official capacities when the principal entity is also named as a defendant in the suit." *Y.S. v. Bd. of Educ. of Mathews Loc. Sch. Dist.*, 766 F. Supp.

21

2d 839, 842 (N.D. Ohio 2011) (quoting *Carter v. Delaware Cnty. Bd. of Comm'rs*, No. 2:07-cv-1189, 2009 WL 544907, at *15 (S.D. Ohio Mar. 3, 2009) (Holschuh, J.)). For these reasons, Defendants Reed and Pollock are not proper Defendants for a Title VI claim.

Finally, the Court addresses the Title VI claim asserted by John Doe against RCS. Defendants argue that this claim fails because the underlying allegations are not based on actions taken by RCS and instead arise out of the email that Defendant Pollock sent to Mr. Rijal instructing him to stop communicating with Plaintiffs. (ECF No. 19, PageID 211.) Defendants correctly note that "there is no vicarious liability under Title VI." *Foster v. Michigan*, 573 F. App'x 377, 389 (6th Cir. 2014); *see also M.J. by & through S.J. v. Akron City Sch. Dist. Bd. of Educ.*, 1 F.4th 436, 453 n.11 (6th Cir. 2021). An entity's liability depends on whether it "participated in, was aware of, or was deliberately indifferent to any discriminatory acts." *Foster*, 573 F. App'x at 389; *M.J. by & through S.J.*, 1 F.4th at 453 n.11. Here, Plaintiffs allege that several RCS administrators were included on the email Defendant Pollock sent to Mr. Rijal. (ECF No. 8, ¶¶ 100, 102.) Plaintiffs also allege that RCS denied them an interpreter. (*Id.* ¶ 129.) At this early stage of the litigation, when the Court accepts these factual allegations as true and draws reasonable inferences in Plaintiffs' favor, the Court concludes that the Amended Complaint alleges RCS was aware of the potentially discriminatory acts.

Even so, John Doe's Title VI claim against RCS encounters the same problem as Plaintiffs' § 1983 equal protection claim against Defendant Pollock—insufficient allegations of discrimination. (*See* ECF No. 19, PageID 210–11.) "The standard for proving a discrimination claim under Title VI is at least as stringent as that for proving an Equal Protection claim." *Vidovic v. Mentor City Sch. Dist.*, 921 F. Supp. 2d 775, 796 (N.D. Ohio 2013); *see also Grutter v. Bollinger*, 539 U.S. 306, 343 (2003) (quoting *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265,

22

287 (1978)) (noting that Title VI "proscribes[s] only those racial classifications that would violate the Equal Protection Clause"). As discussed above, the allegations in the Amended Complaint are insufficient to allege a § 1983 equal protection claim against Defendant Pollock for national origin discrimination, so John Doe's Title VI claim, which arises out of the same conduct, also fails.

But, again, rather than dismissing John Doe's Title VI claim against RCS with prejudice, the Court will dismiss it without prejudice and permit Plaintiffs to file a motion for leave to amend (with a proposed Second Amended Complaint attached) for the limited purpose of attempting to plausibly allege John Doe's Title VI claim against RCS (in addition to Plaintiffs' § 1983 equal protection claim against Defendant Pollock in his individual capacity, discussed above). If Plaintiffs choose to file this motion, they must do so within 30 days of this Order or the dismissal of John Doe's Title VI claim against RCS will automatically convert into a dismissal with prejudice.

To summarize the Court's Title VI analysis, John Doe may move for leave to amend his Title VI claim against RCS, but Defendants' Motion for Judgment on the Pleadings is granted with respect to the Title VI claim brought by Parents 1 and 2 and the Title VI claim asserted against Defendants Reed and Pollock in their individual and official capacities.

## V.    Claims Under State Law

The Amended Complaint includes several state-law claims. All Plaintiffs assert claims for intentional infliction of emotional distress; negligence; negligent hiring, supervision, and retention; and spoliation of evidence against all Defendants. (ECF No. 8, ¶¶ 187–93, 209–44.) In addition, John Doe brings an assault claim against RCS. (*Id.* ¶¶ 194–208.) Defendants argue that

they are immune from liability for Plaintiffs' state-law claims under Chapter 2744 of the Ohio Revised Code, and that those claims fail on the merits, too. (ECF No. 19, PageID 198–206.)

### A.      Sovereign Immunity

The Court first addresses the Parties' sovereign immunity arguments related to Plaintiffs' state-law claims.

### 1.      Defendant RCS and Defendants Reed, Pollock, and Wilhite in Their Official Capacities

Under Ohio law, the common-law concept of sovereign immunity is codified in Chapter 2744. *Miller v. Reed Mem'l Libr.*, No. 5:25-CV-00233-CEH, 2025 WL 2637425, at *2 (N.D. Ohio Sep. 10, 2025). Political subdivisions of Ohio are generally immune from liability for tort claims connected with a governmental or proprietary function. *Id.*; *see* Ohio Rev. Code § 2744.02(A)(1). A political subdivision includes "a municipal corporation, township, county, school district, or other body corporate and politic responsible for governmental activities in a geographic area smaller than that of the state." Ohio Rev. Code § 2744.01(F).

Courts employ a three-step analysis to determine whether a political subdivision is immune from tort liability in Ohio. *Childress v. City of Cincinnati*, 765 F. Supp. 3d 662, 694 (S.D. Ohio 2025) (Cole, J.). This analysis also determines whether an official of a political subdivision sued in his or her official capacity is entitled to immunity. *See id.* First, the court determines whether the general grant of immunity provided by Ohio Revised Code § 2744.02(A) applies. *Id.* (quoting *Wallace v. City of Rossford*, No. WD-17-061, 2018 WL 3203145, at *4 (Ohio Ct. App. June 29, 2018)). If it does, at step two, the court considers whether the exceptions in Ohio Revised Code § 2744.02(B) abrogate immunity. *Id.* Only if an exception applies does the

court proceed to step three to assess whether one of the defenses listed in Ohio Revised Code

2744.03 applies and reinstates immunity. *Id.*

Beginning at step one, it is undisputed that Ohio Revised Code § 2744.02(A) governs

here and RCS is entitled to immunity unless an exception applies. (ECF No. 19, PageID 198;

ECF No. 28, PageID 254.) Under Ohio Revised Code § 2744.02(A)(1), "a political subdivision is

not liable in damages in a civil action for injury, death, or loss to persons or property allegedly

caused by any act or omission of the political subdivision or an employee of political subdivision

in connection with a governmental or proprietary function," subject to exceptions listed in Ohio

Revised Code § 2744.02(B). And governmental functions include providing a system of public

education. *Doe v. Marlington Loc. Sch. Dist. Bd. of Educ.*, 907 N.E.2d 706, 709 (Ohio 2009)

(citing Ohio Rev. Code §. 2744.01(C)(2)(c)).

As such, the Court proceeds to the second step in the immunity analysis and considers

whether exceptions in Ohio Revised Code § 2744.02(B) apply. Plaintiffs argue that Defendants'

immunity is abrogated by Ohio Revised Code § 2744.02(B)(1), which provides:

> Except as otherwise provided in this division, political subdivisions are liable for
> injury, death, or loss to person or property caused by the negligent operation of any
> motor vehicle by their employees when the employees are engaged within the scope
> of their employment and authority.

(ECF No. 28, PageID 255.)

First, the Court considers the intentional tort claims brought by Plaintiffs against RCS,

namely, intentional infliction of emotional distress, assault, and spoliation of evidence. (ECF No.

8, ¶¶ 187–208, 227–44.) Ohio courts have consistently held that the exceptions to immunity

codified at Ohio Revised Code § 2744.02(B) do not apply to the intentional torts of a political

subdivision's employees. *Ohio ex rel. Faulkner v. City of Middletown*, 688 F. App'x 377, 380–

81 (6th Cir. 2017) (finding the exceptions contained under Ohio Revised Code § 2744.02(B) do

25

not "expose municipalities to liability for the intentional torts of municipal employees");

*Gammarino v. Sycamore Township*, No. 24-3149, 2025 WL 674222, at *5 (6th Cir. Mar. 3,

2025) (quoting *Cramer v. Auglaize Acres*, 865 N.E.2d 9, 14 (Ohio 2007)) ("The first four

exceptions in § 2744.02(B) are 'limited to negligent actions.'"). As such, the negligent operation

of a motor vehicle exception to political subdivision immunity does not impose liability on RCS

for Plaintiffs' intentional tort claims.

Next, the Court addresses whether RCS is immune from liability for Plaintiffs' negligent

hiring, supervision, and retention claim. (ECF No. 8, ¶¶ 217–26.) As Defendants note,

*McConnell v. Dudley*, 144 N.E.3d 369 (Ohio 2019), is dispositive on this issue. (ECF No. 19,

PageID 200–01.) In *McConnell*, the Supreme Court of Ohio explained that Ohio Revised Code

§ 2744.02(B) does not provide an exception that "imposes liability on the political subdivision

for its actions in hiring, training, or supervising an employee or entrusting him or her with a

vehicle." *Id.* at 377 ("[N]egligence (or reckless, wanton, or willful conduct) in hiring, training,

and supervising does not fall within the plain language of any of the exceptions established by

R.C. 2744.02(B)(1) through (5)."). Therefore, RCS is immune from suit on this claim.

Lastly, the Court turns to Plaintiffs' negligence claim against RCS. (ECF No. 8, ¶¶ 209–

16.) Defendants argue that Ohio Revised Code § 2744.02(B)(1)—the negligent operation of a

motor vehicle exception—does not apply and they remain immune from suit. (ECF No. 19,

PageID 200–01.) Defendants rely on the Supreme Court of Ohio's decisions in *McConnell v.*

*Dudley*, 144 N.E.3d 369 (Ohio 2019), and *Doe v. Marlington Local School District Board of*

*Education*, 907 N.E.2d 706 (Ohio 2009), as support. (ECF No. 19, PageID 200–01.) In

*McConnell*, the Supreme Court of Ohio reiterated its holding from *Marlington* that "the

exception to immunity in R.C. 2744.02(B)(1) for the negligent operation of a motor vehicle

26

pertains only to negligence in driving or otherwise causing the vehicle to be moved," as well as its rejection of the view that the "'operation' of a school bus also encompasses any other actions, such as a bus driver's supervision of the students who ride the bus." *McConnell*, 144 N.E.3d at 376–77 (quoting *Marlington*, 907 N.E.2d at 710–12).

In response, Plaintiffs do not address *McConnell* or *Marlington*, but rather cite two cases that, at first blush, appear on point and support applying Ohio Revised Code § 2744.02(B)(1) to this case, but are distinct from the instant case in material ways. (ECF No. 28, PageID 255–57.) First, Plaintiffs cite *Groves v. Dayton Public Schools*, 725 N.E.2d 734 (Ohio Ct. App. 1999), where the plaintiff, a disabled minor confined to a wheelchair, suffered injuries because the bus driver failed to secure her wheelchair when he helped her exit the school bus. *Id.* at 735. The Ohio appellate court concluded that Ohio Revised Code § 2744.02(B)(1) had the potential to apply to those facts. *Id.* at 738. Notably, *Groves* was decided before *McConnell* and *Marlington*. And the *Groves* court's holding hinged on its conclusion that securing passengers into wheelchairs while assisting them on or off a bus qualified as operating the school bus. *Id.* at 737. While both *Groves* and the instant case involve disability accommodations on school buses, Plaintiffs have not alleged that John Doe suffered injuries as he was escorted on or off the bus or as he was being secured into his harness, which formed the basis for applying Ohio Revised Code § 2744.02(B)(1) in *Groves*.

Second, Plaintiffs rely on *Swain v. Cleveland Metropolitan School District*, No. 94553, 2010 WL 3722280 (Ohio Ct. App. Sep. 23, 2010), where a kindergarten student was left on a school bus because the bus driver did not check to see if the student remained on the bus at the student's bus stop or at the conclusion of the route. *Id.* at *3. Again, the Ohio appellate court

27

concluded that Ohio Revised Code § 2744.02(B)(1) had the potential to apply.[4] *Id.* at \*1. But, in *McConnell*, a more recent and binding decision, the Supreme Court of Ohio emphasized that the operation of a school bus for purposes of Ohio Revised Code § 2744.02(B)(1) does not encompass "the bus driver's supervision of the students who ride the bus." *McConnell*, 144 N.E.3d at 377. And, here, the allegations underlying Plaintiffs' negligence claim are distinct from those in *Swain*. Plaintiffs allege that Defendants acted negligently by failing to (1) keep them informed of John Doe's whereabouts, (2) provide them with an interpreter, and (3) keep John Doe safe. (ECF No. 8, ¶ 214.) These allegations do not relate to the bus driver's alleged negligence in driving or otherwise causing the vehicle to be moved such that Ohio Revised Code § 2744.02(B)(1) applies.

Because the Court has determined at the second step of the sovereign immunity analysis that no exception applies, it need not proceed to the third and final step of considering whether the defenses in Ohio Revised Code § 2744.03 shield the political subdivision from liability.

### 2. Defendants Reed, Pollock, and Wilhite in Their Individual Capacities

Next, the Court considers whether Defendants Reed, Pollock, and Wilhite, as individuals, are immune from liability with respect to Plaintiffs' state-law claims. Courts use a separate immunity analysis for employees of political subdivisions under Ohio Revised Code § 2744.03. *Childress*, 765 F. Supp. 3d at 695. An employee enjoys immunity unless: "(a) [t]he employee's acts or omissions were manifestly outside the scope of the employee's employment or official

---

[4] Another Ohio appellate court reached the opposite conclusion. *See, e.g.*, *Miller v. Van Wert Cnty. Bd. of Mental Retardation & Developmental Disabilities*, No. 15-08-11, 2009 WL 3068807, at \*6 (Ohio Ct. App. Sep. 28, 2009) (concluding that Ohio Revised Code § 2744.02(B)(1) did not apply because the plaintiff alleged "she was injured when she was left on the bus, which is essentially a claim of negligent supervision," but, under *Marlington*, "negligent supervision of passengers is not 'negligent operation of any motor vehicle'").

28

responsibilities; (b) [t]he employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner; [or] (c) [c]ivil liability is expressly imposed upon the employee by a section of the Revised Code." *Id.*; Ohio Rev. Code § 2744.03(A)(6).

Here, the first and third exceptions are not at issue. The Amended Complaint alleges that Defendants Reed, Pollock, and Wilhite acted within the scope of their employment at all relevant times and the Parties have not identified a section of the Ohio Revised Code that expressly imposes liability on Defendants Reed, Pollock, or Wilhite. (ECF No. 8, ¶¶ 24–26.) Thus, immunity depends on whether the acts or omissions of Defendants Reed, Pollock, and Wilhite were made with a malicious purpose, in bad faith, or in a wanton or reckless manner.

As discussed above, there are no allegations specific to Defendant Reed's conduct such that the Court could plausibly conclude her acts or omissions involved a malicious purpose, bad faith, or wantonness or recklessness. Instead, the allegations in the Amended Complaint are limited to stating that Defendant Reed was responsible for operations and oversight of the RCS district and that she knew or should have known RCS had a duty to provide Parents with an interpreter for communications with RCS. (*Id.* ¶¶ 117, 169.) Therefore, Defendant Reed is entitled to immunity for the state-law claims asserted against her in her individual capacity.

With respect to Defendant Pollock, Plaintiffs allege that he deliberately and intentionally concealed important information about what had happened to John Doe from Parents 1 and 2 by instructing Mr. Rijal to stop communicating with them and failing to provide a replacement interpreter, leaving no way for them to communicate with RCS staff. (*Id.* ¶¶ 4, 9, 102.) Plaintiffs also allege that Defendant Pollock knew about their requests to view the bus video but failed to preserve it. (*See id.* ¶¶ 97–99.) With respect to Defendant Wilhite, Plaintiffs allege that they requested he investigate the February 16, 2023 incident and provide a copy of the bus video on

29

several occasions and Defendant Wilhite promised to do so, but he did not provide follow-up communications on those matters or deliver on those promises. (*Id.* ¶¶ 87–93.) These statements are sufficient to allege that Defendants Pollock and Wilhite acted with a malicious purpose, in bad faith, or in a wanton or reckless manner, and the Court will not dismiss the state-law claims asserted against them based on sovereign immunity grounds at this early stage of the litigation.

### B.      Failure to State a Claim

At this point, a few state-law claims remain: Plaintiffs' claims against Defendants Pollock and Wilhite individually for (1) negligence, (2) negligent hiring, supervision, and retention, (3) intentional infliction of emotional distress, and (4) spoliation of evidence. Defendants argue that these claims fail on the merits, too.

#### 1.      Negligence and Negligent Hiring, Supervision, and Retention Claims

Defendants briefly contend that Plaintiffs' negligence and negligent hiring, supervision, and retention claims fail on the merits. (ECF No. 19, PageID 204–05.) This argument is limited to one statement in Defendants' Motion, which says that the Amended Complaint does not contain allegations that "establish either Wilhite or Pollock had any such duty to supervise John Doe nor that such duty was breached, and the only adult supervisor on the bus—the bus driver— has never been named as a defendant." (*Id.*) Defendants do not elaborate further, and the Court declines to enter judgment in their favor based on these undeveloped points at this time. Defendants may re-raise their arguments in more detail on summary judgment.

#### 2.      Intentional Infliction of Emotional Distress Claim

To prove a claim for intentional infliction of emotional distress, Ohio law requires a plaintiff to show "(1) that the defendant intended to cause the plaintiff serious emotional distress, (2) that the defendant's conduct was extreme and outrageous, and (3) that the defendant's

30

conduct was the proximate cause of the plaintiff's serious emotional distress." *Burgess*, 735 F.3d at 480 (quoting *Phung v. Waste Mgmt., Inc.*, 644 N.E.2d 286, 289 (Ohio 1994)). Defendants argue that Plaintiffs' claim for intentional infliction of emotional distress fails because the alleged conduct of Defendants Wilhite and Pollock falls short of the type deemed outrageous enough to sustain a claim. (ECF No. 19, PageID 204.)

"[T]o say that Ohio courts narrowly define 'extreme and outrageous conduct' would be something of an understatement." *Courie v. Alcoa Wheel & Forged Prods.*, 577 F.3d 625, 633 (6th Cir. 2009) (quoting *Baab v. AMR Servs. Corp.*, 811 F. Supp. 1246, 1269 (N.D. Ohio 1993)). According to the Supreme Court of Ohio:

> It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

*Yeager v. Loc. Union 20, Teamsters, Chauffeurs, Warehousemen & Helpers of Am.*, 453 N.E.2d 666, 671 (1983).

As discussed in more detail above, Plaintiffs allege that Defendant Pollock instructed Mr. Rijal to stop communicating with them and failed to provide a replacement interpreter, leaving Plaintiffs with no way to communicate with RCS and preventing John Doe from obtaining an education. (ECF No. 8, ¶¶ 4, 9, 102.) This conduct goes beyond mere insults, indignities, threats, annoyances, petty oppressions of other trivialities. *See H.M. v. Bd. of Educ. of the Kings Loc. Sch. Dist.*, 117 F. Supp. 3d 992, 1014 (S.D. Ohio 2015) (Barrett, J.). While the standard for extreme and outrageous conduct is a difficult one to satisfy, the Court finds that the allegations against Defendant Pollock are sufficient at this stage in the litigation, when the Court must accept the factual allegations as true and construe reasonable inferences in Plaintiffs' favor.

The allegations against Defendants Wilhite, however, are limited to his failure to investigate the February 16, 2023 incident and produce the bus video, despite Plaintiffs' repeated requests and Defendants Wilhite's promise to do so. (ECF No. 8, ¶¶ 87–93.) These allegations do not satisfy the high threshold Ohio courts impose on claims for intentional infliction of emotional distress. Therefore, the Court denies Defendants' Motion for Judgment on the Pleadings with respect to Plaintiffs' claim for intentional infliction of emotional distress against Defendant Pollock, and grants it as to Defendant Wilhite.

### 3.        Spoliation of Evidence Claim

"Ohio is among only a handful of jurisdictions that recognize the independent tort of intentional spoliation of evidence." *Elliott-Thomas v. Smith*, 110 N.E.3d 1231, 1233 (Ohio 2018). Under Ohio law, this tort has five elements: "(1) pending or probable litigation involving the plaintiff, (2) knowledge on the part of defendant that litigation exists or is probable, (3) willful destruction of evidence by defendant designed to disrupt the plaintiff's case, (4) disruption of the plaintiff's case, and (5) damages proximately caused by the defendant's acts." *Id.* (quoting *Smith v. Howard Johnson Co.*, 615 N.E.2d 1037, 1038 (Ohio 1993)).

Defendants argue that Plaintiffs' spoliation claim must be dismissed because it is premised on speculation and Plaintiffs failed to allege that Defendant Pollock or Wilhite willfully destroyed the bus video. (ECF No. 19, PageID 205–06.) In the Amended Complaint, Plaintiffs allege that they requested access to the bus video on several occasions, including on the day of and the day after the bus incident. (ECF No. 8, ¶¶ 76–78, 81.) Plaintiffs submitted these requests to both Defendants Wilhite and Pollock, and Defendant Wilhite promised to obtain a copy of the bus video for Plaintiffs multiple times. (*Id.* ¶¶ 87, 89–90, 92, 98–99.) Plaintiffs allege that, despite their repeated requests, they never received the video. (*Id.* ¶¶ 88, 93.) Instead,

Defendant Pollock told them the video had been overwritten because of the "lapse in time," yet he was aware of their video request shortly after the bus incident. (*Id.* ¶¶ 97–98.) Plaintiffs allege that "Defendants' willful destruction of evidence was designed to prevent Plaintiffs from learning what happened to their son and was done with a malicious purpose and in bad faith." (*Id.* ¶¶ 241–42.) These allegations are sufficient to survive Defendants' Motion for Judgment on the Pleadings.

## VI.     Punitive Damages

In the Prayer for Relief section of their Amended Complaint, Plaintiffs include a request for punitive damages. (ECF No. 8, PageID 109.) Defendants submit that this request must be dismissed because punitive damages are not recoverable against a political subdivision or a governmental entity under Title VI, § 1983, the Equal Protection Clause, Title II of the ADA, or Section 504 of the Rehabilitation Act. (ECF No. 19, PageID 219.) In response, Plaintiffs argue that they may recover punitive damages against Defendants Reed, Pollock, and Wilhite in their individual capacities. (ECF No. 28, PageID 294.)

Relevant here, under Ohio law, the immunity from punitive damages available to political subdivisions is not available to government employees sued in their individual capacity where the employee's "acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner." *Range v. Douglas*, 878 F. Supp. 2d 869, 896 (S.D. Ohio 2012) (Barrett, J.) (quoting Ohio Rev. Code § 2744.03(A)(6)(b)). As explained above, Plaintiffs may proceed on some of their state-law claims against Defendants Pollock and Wilhite due to alleged malicious purpose, bad faith, or wanton or reckless conduct. If Plaintiffs prevail on these claims, punitive

33

damages may be available. Accordingly, Defendants are not entitled to judgment on the pleadings with respect to Plaintiffs' request for punitive damages.

* * *

To sum, the Court **GRANTS** Defendants' Motion for Judgment on the Pleadings as to the following claims, and **DISMISSES** them:

- All claims asserted against Defendant Reynoldsburg City School District;

- All § 1983 claims asserted against Defendant Reynoldsburg City School District Board of Education, Defendants Reed, Pollock, and Wilhite in their official capacities, and Defendants Reed and Wilhite in their individual capacities;

- The § 1983 right to bodily integrity and failure to train and supervise claims asserted against Defendant Pollock in his individual capacity;

- The Title VI claims asserted against Defendants Reed and Pollock in their individual and official capacities and the Title VI claims brought by Parents 1 and 2;

- All state-law claims asserted against Defendant Reynoldsburg City School District Board of Education, Defendants Reed, Pollock, and Wilhite in their official capacities, and Defendant Reed in her individual capacity;

- The intentional infliction of emotional distress claim asserted against Defendant Wilhite in his individual capacity.

The Court **DENIES** Defendants' Motion for Judgment on the Pleadings as to the following claims, which remain active in this litigation:

- John Doe's ADA claim against Defendant Reynoldsburg City School District Board of Education;

- John Doe's Rehabilitation Act claim against Defendant Reynoldsburg City School District Board of Education;

- Plaintiffs' negligence claim against Defendants Pollock and Wilhite in their individual capacities;

- Plaintiffs' negligent hiring, supervision, and retention claim against Defendants Pollock and Wilhite in their individual capacities;

34

- Plaintiffs' intentional infliction of emotional distress claim against Defendant Pollock in his individual capacity;

- Plaintiffs' spoliation of evidence claim against Defendants Pollock and Wilhite in their individual capacities;

- Plaintiffs' request for punitive damages.

Finally, the Court **DENIES without prejudice to refiling** Defendants' Motion for Judgment on the Pleadings as to the following claims, and **DISMISSES without prejudice** those claims:

- Plaintiffs' § 1983 equal protection claim against Defendant Pollock in his individual capacity;

- John Doe's Title VI claim against Defendant Reynoldsburg City School District Board of Education.

The Court will permit Plaintiffs to file a motion for leave to amend (with a proposed Second Amended Complaint attached) for the limited purpose of attempting to plausibly allege Plaintiffs' § 1983 equal protection claim against Defendant Pollock in his individual capacity and John Doe's Title VI claim against Defendant Reynoldsburg City School District Board of Education. If Plaintiffs intend to file such a motion, they must do so within **30 DAYS** of this Order. Defendants may then file a response and Plaintiffs may file a reply within the time permitted by the Local Civil Rules. If Plaintiffs choose not to file a motion for leave to amend within 30 days, the dismissal of these two claims will automatically convert into a dismissal with prejudice.

**CONCLUSION**

For the reasons above, the Court **GRANTS IN PART** and **DENIES IN PART** (ECF No. 19) Defendants' Motion for Judgment on the Pleadings. The Clerk is **DIRECTED** to terminate Defendant Tracey Reed on the Court's docket.

This case remains open.

**IT IS SO ORDERED.**

3/30/2026            s/Edmund A. Sargus, Jr.
**DATE**             **EDMUND A. SARGUS, JR.**
                 **UNITED STATES DISTRICT JUDGE**